IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY HERNANDEZ, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 17-4381 |
| TEMPLE UNIVERSITY HOSPITAL, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Plaintiff Nancy Hernandez ("Plaintiff" or "Hernandez") commenced this action against Defendant Temple University Hospital ("Temple"), alleging that Temple interfered with her exercise of rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2615-2654 (the "FMLA"), and that it terminated her employment as retaliation for her exercising those rights. Presently before this Court is Temple's Motion for Summary Judgment (Doc. No. 20). For the reasons discussed below, Temple's Motion will be granted.

## I. BACKGROUND

Hernandez was employed by Temple as a medical secretary in its Cardiology practice from July 1, 2008, Def.'s Mot. Summ. J. Ex. 2, until September 30, 2016, id. Ex. 25.[1] Temple terminated her employment on the ground that she had violated the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320a-1320e-3 ("HIPAA"), as well as its own HIPAA Privacy/Security Agreement by examining the medical records of a patient named Shonda

---

[1] Hernandez also was employed by Temple from January 10, 2005 to September 15, 2006. See Def.'s Mot. Summ. J. at 4 & Ex. 1. That period is not at issue in the present case.

Younge ("Younge"), without a legitimate reason for doing so.  Def.'s Mot. Summ. J. at 8-10; id. Ex. 5, at 11-12.  Hernandez contends that the actual reason for her termination was in retaliation for her actions in taking advantage of her rights under the FMLA.  Opp'n (Doc. No. 28) at 1-2. She also maintains that her immediate supervisor, Valencia Church ("Church"), interfered with her exercise of her FMLA rights.  Id. at 2.  Hernandez, however, has failed to raise a genuinely disputed issue of material fact in support of those claims.

A.  **Hernandez's FMLA Leave Requests**

Hernandez has a daughter who suffers from severe asthma symptoms and requires frequent treatment.  From 2008 through 2016, Hernandez requested, and Temple approved, numerous periods of intermittent or continuous FMLA leave to allow Hernandez to care for her daughter.[2]  Two of those leave periods are potentially at issue in this case.  On February 18, 2016, Temple approved intermittent leave for Hernandez to obtain treatment for her daughter two times every three months, with each episode requiring no more than four hours.  Def.'s Mot. Summ. J. Ex. 21, at TU 000285.  The approval covered the period from February 16, 2016 to February 15, 2017.  Id.  In July 2016, Hernandez submitted an application to recertify her to take FMLA leave with greater frequency.  Id. Ex. 24, at 21-22, Ex. 25, at TU 000257-62.  There is a factual dispute regarding what prompted Hernandez to seek recertification.  Hernandez asserts that her supervisor, Church, instructed her that she needed to reapply ("recertify") for her FMLA leave.  Dep. Tr. of Nancy Hernandez-Smith, Def.'s Mot. Summ. J. Ex. 4, at 145-46 [hereinafter "Hernandez Dep."].[3]  She contends that she was not required to do so because the FMLA did not

---

[2]     Temple alleges that it approved 11 separate FMLA leave requests for Hernandez.  Def.'s Mot. Summ. J. at 11.  The exhibit it cites for that proposition, however, only reflects eight leave requests.  Id. Ex. 21.

[3]     At the time of these events, Hernandez's name was Hernandez-Smith.  Def.'s Mot. Summ. J. Ex. 4, at 7.

require her to recertify any more frequently than every six months, and July 2016 was only five months from her prior certification. Opp'n at 19-20. Thomas F. Johnston, Temple's Director of Workers' Compensation and Absence Management, testified that he "vaguely" remembered that some issue had arisen regarding whether Hernandez was using more than her allotted leave and that Hernandez had informed him that she needed more frequent leave periods. Dep. Tr. of Thomas Johnston, Opp'n Ex. E, at 21-22 [hereinafter "Johnston Dep."]. Temple contends that Hernandez needed to recertify because she required more leave than had previously been approved.[4] Def.'s Mot. Summ. J. at 12. In any event, it is undisputed that Hernandez did submit a request for intermittent leave in July 2016 and that she sought authorization to take FMLA leave much more frequently than had previously been approved for her.[5] Id. at 12-13; Opp'n at 20. Temple approved Hernandez's request on September 1, 2016, granting her intermittent leave of up to two hours per week for her daughter to obtain testing and up to four hours once a month for her daughter's medical examinations. Def.'s Mot. Summ. J. Ex. 25, at TU 000253. Requests for FMLA leave by Temple employees were handled by Temple's Human Resources Department. Dep. Tr. of Valencia Church., Opp'n Ex. B, at 13-14 [hereinafter "Church Dep."]. Church had no involvement in determining whether such leave was granted. Id.

### B. Church's Alleged Harassment of Hernandez for Taking Her FMLA Leave

Hernandez alleges that Church harassed her regarding taking FMLA leave. Opp'n at 3-4. She contends that Church would question the validity of her daughter's illness, asking "[w]ell,

---

[4]    As discussed infra in Section III(A), this factual dispute is not material to the outcome of this case.

[5]    Hernandez's written application is dated August 12, 2016 because she initially submitted her request via Temple's electronic portal and then delayed in submitting the supporting documents for her request. Johnston Dep. at 22, 49-50, 52.

how sick is your daughter? . . . How bad is her asthma?  Like, is it really that bad?"  Hernandez

Dep. at 131; see also id. at 129.  She also claims that Church would demand a doctor's note each

time that she took leave even though Temple's policy did not require her to provide such notes.[6]

Id. at 129-30.  She stated generally that Church gave her "a hard time" each time she took FMLA

leave, id. at 129, and that Church was "hostile" to her, id. at 147.  She further maintains that

when she would return from taking FMLA leave, Church would give her a larger workload as a

form of punishment.[7]  Id. at 156-64.  She contends that other employees who took FMLA leave

were not questioned in the same way.[8]  Id. at 147-49, 154-55.  Hernandez also testified that it

was Church who told her, without explanation, that she needed to reapply for her leave in July

2016.  Id. at 145-46.

### C.    Hernandez's Dispute with Younge

Hernandez asserts that, beginning in June 2016, id. at 42-43, Younge began harassing her

through phone calls and letters to her at her work and through text messages, id. at 39, 42.

Hernandez testified that Younge's intention was to take her husband away from her.  Id. at 39,

43.  Younge stated as much in a text message to her.  Id. at 43.  On June 24, 2016, Hernandez

sent a letter to Younge demanding that she "cease and desist" making those harassing

communications.  Def.'s Mot. Summ. J. Ex. 10.  Hernandez stated that she obtained Younge's

---

[6]    Church testified that she believed a doctor's note was required for every occasion when an employee approved for intermittent FMLA leave actually took that leave.  Church Dep. at 18. However, Church's supervisor, Denise Reynolds, testified that an employee with approved intermittent FMLA leave was not required to submit a doctor's note for each individual time when he or she used that leave.  Dep. Tr. of Denise Reynolds, Opp'n Ex. C, at 43-44.

[7]    Hernandez also testified, however, that she "probably" was given extra work because she was the most knowledgeable and dependable secretary.  Hernandez Dep. at 163.

[8]    Notably, Hernandez's testimony that Church treated her differently than other employees who took FMLA undercuts her argument that Church's alleged hostility to her was caused by the fact that she took FMLA leave.

name and address by "googling" the phone number from the text messages. Hernandez Dep. at 43. The next day, Hernandez filed a complaint against Younge with the police. Def.'s Mot. Summ. J. Ex. 11. On July 29, 2016, Younge sent a letter to Hernandez stating the following: "I wanted to let you know that i [sic] set you up to loose [sic] your job and im [sic] still gonna pursue your husband. You should keep a close eye on your kids." Opp'n Ex. O. On August 5, 2016, Hernandez's attorney sent a letter to Younge demanding that she cease contacting Hernandez in any manner. Def.'s Mot. Summ. J. Ex. 8. On November 10, 2016, Hernandez sent Younge another cease and desist letter. Id. Ex. 12. On November 14, 2016, she filed a second complaint against Younge with the police. Id. Ex. 13.

### D. Temple's HIPAA Policies

Temple requires any of its personnel who may be required to have access to a patient's protected health information to sign and agree to be bound by The Temple University Health System HIPAA Agreement (the "HIPAA Agreement"). Def.'s Mot. Summ. J. Ex. 6, at TU 000001. The HIPAA Agreement provided that an employee would not access a patient's protected health information unless doing so was essential for the employee to perform his or her duties. Id. The HIPAA Agreement incorporated Temple's Policy Number 220—its Patient Privacy and Confidentiality Policy—and Policy Number 400—its Computer Usage Policy. Id. Policy 220 provided in relevant part that "[o]nly those physicians and healthcare workers who are **directly** involved with the patient's care shall have access to the patient's medical records." Id. Ex. 7, at TU 000704 (emphasis in original). Policy 400 stated in relevant part that "[y]ou may not access or copy directories, programs, files, data, or documents which do not belong to you or which you are not authorized to access and copy." Id. at TU 000712. Both policies contained provisions stating that a violation of the policies "may result in disciplinary action up

to and including termination." Id. at TU 000704, TU 000713. In addition, the HIPAA

Agreement itself also contained the same provision regarding sanctions for violations of that

agreement. Id. Ex. 6, at TU 000002. Hernandez signed the HIPAA Agreement on August 20,

2008. Id.

     **E.**      **Events Leading to Hernandez's Termination**

Younge was a patient of Temple's Obstetrics and Gynecology ("OBGYN") practice.

Dep. Tr. of Denise Reynolds, Opp'n Ex. C, at 23 [hereinafter "Reynolds Dep."]. She was not a

patient of Temple's Cardiology practice, where Hernandez worked. See id. at 11. On Friday,

September 23, 2016, Younge made a formal complaint to the administration of the OBGYN

practice regarding what she claimed was a breach of her privacy. See Def.'s Mot. Summ. J. Ex.

14, at TU 000507. She informed them that she had previously dated Hernandez's husband for a

brief time in May and June of 2016. Id. She believed that Hernandez had obtained her telephone

number from her husband's phone. Id. Younge reported that Hernandez had been placing

belligerent calls to her and making physical threats. Id. She stated that Hernandez had sent a

text message to her indicating that she knew Younge's address and that of her mother and stating

their correct addresses. Id. Younge insisted that she had never revealed her mother's address to

Hernandez's husband during their brief relationship and that she was convinced that Hernandez

had obtained that information from her medical records at Temple. Id. She complained that her

rights under HIPAA had been violated and asserted that she feared for her safety and that of her

mother. Id. She requested that Temple investigate the situation. Id.

The manager of Temple's OBGYN practice, Kendra Hines ("Hines"), emailed this

information to Temple's Chief Compliance Officer, Annamarie Maikner ("Maikner"), on the

next Monday, which was September 26, 2018, and copied both Reynolds and Church on the

email.  Id. at TU 000510; see also Reynolds Dep. at 11 (identifying Maikner as Chief

Compliance Officer).  The next day, Maikner requested a member of her staff to run an "audit

trail" in their computerized record system in order to determine whether Hernandez had looked

at Younge's medical records.  Def.'s Mot. Summ. J. Ex. 14, at TU 000509.  That system, known

as EPIC, permitted Temple's IT staff to identify whether any staff member had reviewed a

particular patient's medical records and to provide a second-by-second log of each portion of the

records that they reviewed.  Dep. Tr. of Alyce Gontz, id. Ex. 16, at 18-19.  That audit trail

established that Hernandez had accessed Younge's gynecological records on five occasions

between June 24, 2016 and July 20, 2016.  See id. Ex. 15.  In addition, it revealed that, on the

first occasion that she reviewed Younge's records, June 24, 2016, Hernandez did so for an

extended period from 10:56 to 15:01.  Id. Ex. 15, at TU 000516-28.[9]  Maikner's staff forwarded

the audit results to her.  Id. Ex. 14, at TU 000509.  Based on those results and Younge's

complaint, Maikner made the decision to terminate Hernandez's employment.  Reynolds Dep. at

11-12.  Before she could implement that decision, however, she was required to obtain the

approval of an attorney in Temple's Labor Relations Group, Temple's Executive Director of

Human Resources and its Chief Operating Officer.  Id. at 33-34.  Neither Church nor her

supervisor, Reynolds, were responsible for determining that Hernandez should be fired.  See id.

at 11-12, 22; Church Dep. at 24-25.

---

[9]     Temple asserts that the records Hernandez reviewed included doctors' notes, lab tests results for sexually transmitted diseases, urine analyses, pathology reports and medical insurance information.  Def.'s Mot. Summ. J. at 9.  Although Hernandez does not dispute that assertion, Temple provided the audit results in a computer-generated chart that is largely incomprehensible to persons not already familiar with their meaning and it did not provide any basis for the Court to interpret them.  Nevertheless, the fact that Hernandez reviewed Younge's protected medical records without proper authority to do so renders the specific types of gynecological records she reviewed unimportant.

Reynolds and Church met with Hernandez on September 30, 2016. See Reynolds Dep. at 12; Def.'s Mot. Summ. J. Ex. 26. A union representative participated in the meeting by telephone. Reynolds Dep. at 12-13. The parties dispute what transpired at that meeting. Hernandez testified at her deposition that she recalled "not too much" regarding the content of the meeting. Hernandez Dep. at 114. Nevertheless, she asserts that the only information that she was given regarding the reason for her termination was that it was for "gross neglect" and that Reynolds and Church did not even mention Younge's name during the meeting. Id. at 104-05. Reynolds testified that she asked Hernandez whether she knew Younge and that Hernandez denied knowing her. Reynolds Dep. at 13-14, 17. She further testified that she informed Hernandez that she had an audit record that showed that Hernandez examined Younge's records multiple times. Id. at 14.

## II.  SUMMARY JUDGMENT STANDARD

Under the well-established summary judgment standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Williams v. Wells Fargo Bank, No. 14-2345, 2015 WL 1573745, at *3 (E.D. Pa. Apr. 9, 2015) (quoting Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012)).

> [T]he plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his or] her case with respect to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006). To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (quoting Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)); see also Anderson, 477 U.S. at 252.

## III.  DISCUSSION

### A.  Temple is Entitled to Summary Judgment on Hernandez's Claim that It Interfered with Her Exercise of FMLA Rights

In Count I of her Complaint, Hernandez claims that Temple violated the FMLA by interfering with her attempts to exercise her FMLA rights. She bases her claim on 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

Opp'n at 14-18.  The applicable regulations provide that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  Hernandez asserts that Temple "discouraged" her from exercising her FMLA leave through Church's conduct in questioning the extent of her daughter's illness, demanding a doctor's note for each leave period taken when doctors' notes were not required, increasing her workload and generally giving her "a hard time" for taking leave.  Opp'n at 16.  She claims that Church's conduct made her "'stressed every time [she] took leave'" and made her feel "'discouraged about taking her allowed leave.'"  Id. (quoting Hernandez Dep. at 153).  She alleges that these allegations create a "reasonable inference . . . that Church discouraged her from using her FMLA leave and made her reluctant to invoke her allotted leave time," thereby "chill[ing her] assertion of her rights under the FMLA."  Id. at 16-17.  She argues that that conduct is sufficient to establish interference for the purposes of defeating summary judgment.  Id. at 17.  Hernandez is mistaken.

To establish a claim for interference under the FMLA, a plaintiff must establish that:

"(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."

Capps v. Mondelez Global, LLC, 847 F.3d 144, 155 (3d Cir. 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014)).

Hernandez fails to satisfy the fifth element of this standard.  The FMLA "provides no relief unless the employee has been prejudiced by the violation . . . ."  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002).  "The Third Circuit has unequivocally stated that 'for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld.'"  Shann v. Atl. Health Sys., No. CV124822ESMAH, 2017 WL 5260780, at *19

(D.N.J. Nov. 13, 2017) (quoting <u>Ross</u>, 755 F.3d at 191-92); <u>accord</u> <u>Capps</u>, 847 F.3d at 156.  An employee who obtains "all of the [FMLA] benefits to which he [or she] is entitled by taking leave and then being reinstated to the same position from which he [or she] left cannot satisfy the fifth prong of the interference analysis, [and thus,] he [or she] fails to make a prima facie showing of interference . . . ." <u>Ross</u>, 755 F.3d at 192; <u>accord</u> <u>Capps</u>, 847 F.3d at 155.

In this case, Hernandez testified that Temple approved her leave requests "every single time" that she requested leave.  Hernandez Dep. at 128.  She further testified that, despite Church's alleged harassment of her regarding leave, she took leave whenever she believed that her daughter needed her.  <u>Id.</u> at 145; <u>see also</u> <u>id.</u> at 131-32.  She alleged that she felt "stressed" every time she took leave and that the harassment made her feel discouraged from taking leave, but she also stated that she took her leave regardless of those feelings.  <u>See</u> <u>id.</u> at 153.  Hernandez argues that "a reasonable inference from [her] testimony [regarding Church's harassment] is that Church discouraged her from using her FMLA leave and made her reluctant to invoke her allotted leave time to care for her daughter."  Opp'n at 16-17.  While Church's alleged conduct could be inferred to have discouraged Hernandez from taking leave, the fact is that she testified that it did not do so and that she took leave as needed despite that alleged conduct.  Hernandez Dep. at 153.  In the absence of proof that the employer's purported discouragement caused the employee not to take leave that he or she otherwise would have taken, the employee cannot establish an interference claim.  <u>See</u> <u>Fraternal Order of Police, Lodge 1 v. City of Camden</u>, 842 F.3d 231, 246 (3d Cir. 2016) (reprimands for taking leave "must occur in tandem with actual harm" to constitute actionable interference with FMLA rights); <u>Shann</u>, 2017 WL 5260780, at *19 (to establish an interference claim based on discouragement, the employee must show that the discouragement actually resulted in a denial of FLMA benefits); <u>Griffith v. PNC Bank</u>, No.

CIV. 13-5407 RBK/KMW, 2015 WL 2400222, at *13-14 (D.N.J. May 20, 2015) (holding that to state an interference claim, a plaintiff must establish that he or she "was chilled from requesting further FMLA leave that he or she would have been entitled to" but for the employer's discouragement or that he or she was denied leave that he or she actually requested). Here, Hernandez cannot show that Church's conduct caused her to take any less leave time than she otherwise would have. In the absence of such prejudice, her claim that Church interfered with her FMLA rights must fail.

Hernandez's claim that Temple interfered with her FMLA rights by requiring her to recertify after five months instead of six months lacks merit for the same reason. Hernandez cites to 29 C.F.R. § 825.220(b) for the proposition that "[a]ny violation of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA]." Assuming for the sake of argument that Church actually did direct Hernandez that she was required to recertify in July 2016, Hernandez's argument falls short for lack of a showing of actual harm. The United States Supreme Court in Ragsdale rejected the possibility that an employer could be found liable under § 825.220 for violating FMLA regulations without a showing that the violation of the regulations caused the plaintiff actual harm. 535 U.S. at 88-91. In cases in which an employer has failed to follow the regulations' requirement that it advise the employee of his or her rights under the FMLA, the Third Circuit has repeatedly held that the lack of notice does not lead to a cause of action unless it "'rendered [the employee] unable to exercise the right to leave in a meaningful way, thereby causing injury.'" Lupyan v. Corinthian Colls., Inc., 761 F.3d 314, 318-19 (3d Cir. 2014) (quoting Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004)); accord Capilli v. Whitesell Constr. Co., 271 F. App'x. 261, 267 (3d Cir. 2008).

In the present case, Hernandez has failed to present any evidence from which the Court could conclude that she was prejudiced by Temple's alleged violation of the FMLA regulations. In July 2016, she apparently needed a significant increase in her allotted leave frequency in order to take her daughter for testing and treatment.  See Def.'s Mot. Summ. J. Ex. 25, at TU 000253, TU 000257-62.  Regardless of whether she did so of her own volition or at the direction of Church, Hernandez did apply to Temple's Human Resources Department in July 2016 for more frequent intermittent leave, see Johnston Dep. at 22, and was granted a substantial increase in her allotted frequency, from eight hours every three months to 36 hours every three months, compare Def.'s Mot. Summ. J. Ex. 21 at TU 000253 with id. at TU 000254.  Her request was approved on September 1, 2016 and backdated to be effective as of the time she filed her request on July 21, 2016.  Id. at TU 000253.  She does not allege that Temple prevented her from taking any of the newly allotted leave that she felt was necessary or that she actually was discouraged to take her leave to the point where she chose not to do so.  See Hernandez Dep. at 128, 131-32, 145. Consequently, she cannot show that she suffered any prejudice from allegedly being required to recertify a month earlier than she asserts was required[10] and her claim for interference based on the alleged recertification requirement must fail.

**B.** **Temple is Entitled to Summary Judgment on Hernandez's Retaliation Claim**

**1.** **The Legal Standard for Retaliation Claims**

Hernandez asserts that Temple violated the FMLA by terminating her employment in retaliation for her exercise of her FMLA rights in taking leave.  Opp'n at 24-28.  "Since FMLA

---

[10]    In light of the absence of prejudice, it is unnecessary to resolve the parties' dispute regarding whether Church's alleged request that Hernandez recertify for additional leave hours less than six months after the approval of her earlier FMLA application violated the applicable regulations.

retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. . . . Accordingly, a claim such as [Plaintiff's] FMLA retaliation claim is assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Capps, 847 F.3d at 151(internal citation and quotation marks omitted). In the context of alleged FMLA retaliation, that framework requires that:

> a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

Id. at 152 (internal quotation marks omitted).

### 2. **Hernandez Has Failed to Establish a Prima Facie Case**

To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate that: (1) he or she took FMLA leave; (2) he or she suffered an adverse employment action; and (3) there was a causal connection between his or her leave and the adverse action. Conoshenti, 364 F.3d at 146. Here, the first two requirements of this test are not in dispute. See Def.'s Mot. Summ. J. at 17-18. Temple does challenge, however, whether Hernandez can establish a causal connection between her taking FMLA leave and her termination. Id.

To establish causation, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with the timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and

defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr., 503 F.3d 217, 232 (3d. Cir. 2007) (citing Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)).

This is not such a case. As the United States Supreme Court has recognized, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark Cty. Sch. Dist, 532 U.S. at 273-74; accord Eskridge v. Phila. Housing Auth., 722 F. App'x 296, 299 (3d Cir. 2018). "[T]here is no bright-line rule as to what amount of time is unusually suggestive." LeBoon, 503 F.3d at 232. The Third Circuit "ha[s] found that a temporal proximity of two days is unusually suggestive of causation." Blakney v. Philadelphia, 559 F. App'x 183, 186 (3d Cir. 2014) (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)). That court also "ha[s] held that a temporal proximity greater than ten days" is not itself sufficiently suggestive to establish causation but instead, "requires supplementary evidence of retaliatory motive." Id. at 186; see also Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573, 587 (E.D. Pa. 2017) (stating that "[w]hen a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity"); Cullison v. Dauphin Cty., Pa., No. 1:10-CV-00705, 2012 WL 3027776, at *11 (M.D. Pa. May 18, 2012) (stating that "for a causal connection to be made [based on proximity alone], the temporal proximity between the occurrences has generally been in terms of hours or days, not months"), report and recommendation adopted, No. 1:10-CV-705, 2012 WL 3026784 (M.D. Pa. July 24, 2012).

Hernandez argues that a sufficient inference of causation exists to establish her prima facie case because the one month between September 1, 2016, the date on which Temple approved Hernandez's request for a greater allotment of intermittent leave days, and her

termination on September 30, 2016 is itself "unusually suggestive" of retaliation.  Opp'n at 25-26.  Her argument, however, mistakes the relevant date to be used for comparison to the date of termination.  The relevant date for determining proximity is the date the plaintiff "invoke[s] the protections of the [FMLA]."  Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014); Innella v. Lenape Valley Found., 152 F. Supp. 3d 445, 458 (E.D. Pa. 2015) (same); see also Blakney, 559 F. App'x at 185-86 (stating measurement of the proximity test as beginning with "the employee's protected activity" (citing Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000) (same)).  An employee invokes the protections of the FMLA when he or she applies for FMLA leave.  See Budhun, 765 F.3d at 256; Innella, 152 F. Supp. 3d at 458.  When the employee has made multiple requests for FMLA leave or a request for intermittent leave, courts look to the last application for FMLA leave or to the last instance in which the worker engaged in the protected activity of taking FMLA leave.  See Reyer, 243 F. Supp. 3d at 579-80, 587 (finding that for employee who took intermittent leave, proximity was measured from the time of his last leave period when his allotted leave time expired); see also Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 323-24, 332-33 (3d Cir.) (measuring proximity based on the last protected activity), cert. denied, 137 S. Ct. 82 (2016); Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177-78 (3d Cir. 1997) (measuring proximity from "last protected activity"); Innella, 152 F. Supp. 3d at 450 n.5, 458 (measuring proximity from the last time the plaintiff requested leave); Fitzgerald v.  Shore Mem'l Hosp., 92 F. Supp. 3d 214, 222-24 (D.N.J. 2015) (measuring proximity for an employee with intermittent FMLA leave from the last of several times when she took her leave).

In this case, the last date on which it could be argued that Hernandez invoked the protections of the FMLA was the last time that she submitted a request to use her FMLA leave

on August 16, 2016.[11] Opp'n Ex. J. Temple terminated her employment on September 30, 2016, Def.'s Mot. Summ. J. at 9-10 (citing Reynolds Dep. at 11-12), which is more than six weeks later. Thus, the termination was significantly more removed from the date of the last protected activity than the "very close" proximity that has been required before a retaliatory motive has been imputed without additional evidence of animus. Clark, 532 U.S. at 273; see, e.g., Blakney, 559 F. App'x at 186 ("we have . . . held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive"); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (three weeks was not close enough to raise an inference of causation); Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) (noting that "six days is at the long end of what has been held to be unusually suggestive"). Thus, the six-week proximity of Hernandez's last protected activity to her termination cannot, by itself, provide a basis for finding discriminatory animus sufficient to establish a prima facie case.

Timing that is not sufficiently close to establish an inference of retaliatory intention by itself, however, still may be considered as part of a showing of retaliatory intent if it is supported by other evidence of such intent. "[W]here the temporal proximity is not so close as to be unduly suggestive," the appropriate test is "timing plus other evidence." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000). Such other evidence of retaliation can arise from "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated

---

[11]     At that time, Temple had yet to approve her July request for increased FMLA leave authorization due to her failure to submit the required documentation. See Opp'n Exs. I-K; Johnston Dep. at 49-50, 52. As a result, Hernandez subsequently withdrew that request and resubmitted it as a request for personal leave. Opp'n Exs. I-K. The last FMLA leave day that Hernandez actually took was July 18, 2016. Opp'n at 5 (citing Johnston Dep. at 40). Although Hernandez later received retroactive approval of her July 21 request for an increase in the frequency with which she could take her leave, neither party asserts that she actually took any of the increased leave time available after that leave request was granted. See Def.'s Mot. Summ. J. at 11-13; Opp'n at 6.

reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." LeBoon, 503 F.3d at 232-33 (citing Farrell, 206 F.3d at 279-81).

Hernandez seeks to find that other evidence here in her assertion that Church questioned her use of FMLA leave and generally gave her a "hard time" about it and in her allegation that Temple did not ask her for her version of events before terminating her employment. Opp'n at 26-29. Neither of these alleged events, however, are sufficient to create an inference of discriminatory animus. Although a factual dispute exists regarding Hernandez's allegation that Church harassed Hernandez in connection with her FMLA leave, that dispute is not determinative of the outcome of the present Motion. Hernandez has not alleged that any Temple personnel other than Church ever demonstrated any resistance to her FMLA leave requests. Indeed, she testified to the contrary that Temple had approved every FMLA leave request that she had submitted. Hernandez Dep. at 128, 164. The record is undisputed that Church did not initiate the investigation that led to Hernandez's termination. See Def.'s Mot. Summ. J. Ex. 14. That investigation was initiated by a manager in the OBGYN practice, Hines, in response to a complaint lodged by Younge that Hernandez had violated her HIPAA privacy rights. Id. The investigation was carried out by Temple's Chief Compliance Officer, Maikner. See id. Exs. 14-15; Reynolds Dep., at 11-12. The determination to terminate Hernandez's employment was made by Maikner, Reynolds Dep. at 11-12, with the approval of an attorney in Temple's Labor Relations Group, Temple's Executive Director of Human Resources, and its Chief Operating Officer, id. at 33-34. Neither Reynolds nor Church participated in making the decision that Hernandez should be fired. See id. at 11-12, 22; Church Dep. at 24-25. Thus, even assuming that Church expressed hostility to Hernandez's use of FMLA leave, Hernandez has failed to raise

a genuine question of fact regarding whether Church's alleged animus played any role whatsoever in Temple's decision to terminate her employment.

In addition, even in cases where the proximity of events and/or other evidence of retaliatory animus is sufficient to create an inference of causation, "[a] causal link between an employee's protected activity and an adverse employment action can be broken by an intervening event." Checa v. Drexel Univ., No. 16-108, 2016 WL 3548517, at *6 (E.D. Pa. June 28, 2016) (citing Weiler v. R&T Mech., Inc., 255 F. App'x 665, 669 (3d Cir. 2007)). An act of misconduct occurring between the dates of the protected activity and adverse employment action is the type of intervening event that can destroy what otherwise would be an inference of retaliation. Id. (employee's written resignations and their content destroyed the inference of causation even though adverse action was taken less than two days after the protected activity); see also Weiler, 255 F. App'x at 667-69 (fourteen-day proximity did not establish causation where, in the interim, employee abandoned a job site causing employer to lose substantial sums of money); Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 760 (W.D. Pa. 2016) (10-day proximity did not create inference of retaliation when employer received an ethics complaint regarding employee during the interim), aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores, 704 F. App'x 152 (3d Cir. 2017).

Thus, here, even if Hernandez's evidence were deemed to create an inference of causation sufficient to state a prima facie case, that inference would be destroyed by Hernandez's intervening misconduct in reviewing a patient's medical records without authority to do so. That misconduct, which under Temple's HIPAA policy was itself sufficient to justify termination, Def.'s Mot. Summ. J. Ex. 7, at TU 000704 (Policy 220), TU 000713 (Policy 400), defeats any inference that could otherwise arise that the termination was caused by Hernandez's previous

requests to take FMLA leave.  See Weiler, 255 F. App'x at 668-69; Checa, 2016 WL 3548517, at

*6; Caplan, 210 F. Supp. 3d at 760.  Thus, no basis exists to create an inference of causation

sufficient to meet Hernandez's obligation to present a prima facie case, and summary judgment

is warranted based on that failure alone.

### 3. Temple Has Stated A Legitimate Nondiscriminatory Basis for Its Termination of Hernandez's Employment

Even if it were to be assumed that Hernandez had established a prima facie case of

retaliation, Temple has articulated a legitimate nondiscriminatory reason for her termination—

the alleged violation of Temple policy and HIPAA.  "The employer satisfies its burden of

production by introducing evidence which, taken as true, would permit the conclusion that there

was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie,

32 F.3d 759, 763 (3d Cir. 1994).  An employer's "burden is one of production, not persuasion; 'it

can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  It is

beyond doubt that violation of an employer's privacy policies or of HIPAA are a legitimate

ground for adverse employment action.  See, e.g., Terrell v. Main Line Health, Inc., 320 F. Supp.

3d 644, 657 (E.D. Pa. 2018); Kopko v. Lehigh Valley Health Network, No. 14-1290, 2016 WL

6442062, at *8-9 (E.D. Pa. Oct. 31, 2016); see also DeCicco v. Mid-Atl. Healthcare, LLC, 275 F.

Supp. 3d 546, 555-56 (E.D. Pa. 2017) (noting that violation of internal company policies may

constitute a legitimate, nondiscriminatory reason for termination); Garrow v. Wells Fargo Bank,

N.A., No. 15-1468, 2016 WL 5870858, at *6 (E.D. Pa. Oct. 7, 2016) ("Violating [employer

company] policy is undoubtedly a legitimate and nondiscriminatory reason for termination.").

Thus, Temple has satisfied its burden and the burden shifts to Hernandez to prove that stated

reason was pretextual.

**4. Hernandez Has Failed to Raise a Genuine Factual Dispute Over Whether Temple's Stated Reason for Her Termination Was Pretextual**

Where, as here, an employer meets its burden to articulate a legitimate, nondiscriminatory reason for its action, to defeat a motion for summary judgment, a plaintiff must present sufficient evidence to create a genuine factual dispute as to "both [whether] the employer's proffered explanation was false, and [whether] retaliation was the real reason for the adverse employment action." Krouse, 126 F.3d at 501. In order to prove pretext, the factfinder must focus on whether there are "such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reason for its action" that they are "unworthy of credence." Fuentes, 32 F.3d at 765. Liability cannot be established based upon a factfinder's "mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the [factfinder's] *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370-71 (W.D. Pa. 2012) (emphasis in original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (emphasis added)). A plaintiff must show "not merely that [Defendants'] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). Accordingly, the question "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decision is discrimination. Id.

Hernandez's sole argument for pretext is that Maikner's failure to interview her rendered Maikner's investigation so inadequate that "a factfinder could disbelieve the employer's articulated legitimate reason" for her termination. See Opp'n at 27-28. Hernandez asserts that

Temple's alleged failure to question her about her reasons for reviewing Younge's medical records is sufficient to show that Temple's stated reason for her termination was a pretext and that her termination was caused instead by retaliation for taking FMLA leave. On the evidence presented here, this argument is an insufficient basis to raise a genuine factual dispute regarding whether Temple's stated reason for Hernandez's termination—the alleged violation of HIPAA and of Temple's policies—was pretextual. Temple received a complaint from a patient that one of its employees had violated her right to privacy of her medical records. See Def.'s Mot. Summ. J. Ex. 14. It is undisputed that Temple's policies made it a terminable offense for a Temple employee who was not "directly involved" in that patient's care or was not otherwise duly authorized to access the patient's records. Id. Ex. 7, at TU 000704, TU 000712-13. Hernandez was not a part of Temple's OBGYN practice, of which Younge was a patient, but was employed by its Cardiology practice, of which Younge had never been a patient. Reynolds Dep. at 8, 11, 14-15. Upon receiving notice of Younge's complaint, Maikner conducted an investigation of whether Hernandez had accessed the records anyway. See id. Ex 14; Reynolds Dep. at 25. When the computerized records proved beyond dispute that Hernandez had accessed Younge's records multiple times, including one time that lasted for hours, see Reynolds Dep. at 25, 30-31, Maikner concluded that Hernandez should be terminated. See id. at 25, 33-34. Reynolds testified that she believed there was no reason for Hernandez, who was a medical secretary in the Cardiology practice, to access the records of a Temple patient who was not a patient of that practice. Id. at 15-16. She testified that she believed it unnecessary to interview Hernandez, because the evidence proved that Hernandez had violated HIPAA on multiple occasions and that those violations rendered any explanation regarding Younge's and

Hernandez's dispute and conduct irrelevant.[12] Id. at 36-39. Given that Temple's policies made improper access to a patient's records a basis for termination, Reynolds' testimony is not sufficiently unbelievable to cause a reasonable juror to conclude that the alleged HIPAA violation was a pretext and that the actual reason for Hernandez's termination was FMLA retaliation.

Moreover, even if Maikner's investigation was less thorough than it arguably should have been, that alone is insufficient to establish pretext. See Fuentes, 32 F.3d at 765 ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). "Because the ultimate question is whether discriminatory animus determined the employer's action, an employee cannot discredit the

---

[12] Hernandez argues that, if she had been asked for her version of events, she could have explained why she might have had a proper reason to review Younge's record because Younge may have asked her to do so. Opp'n at 7-8. Her testimony regarding this purported defense, however, is uncertain and utterly unconvincing. Hernandez testified that Younge "probably— she may have called to just get an appointment where she had at another facility. She may have called to ask, you know for assistance with something else, where another phone number could be at another department. It could be multiple things." Hernandez Dep. at 78. She also testified that she could not remember if Younge had actually called her and asked her to look at Younge's records. Id. at 77. When asked if she would have helped Younge if Younge had made such a call, Hernandez testified that "[m]ost likely I probably did." Id. at 78. She explained why she would have assisted Younge despite their personal dispute by stating that she would have helped Younge "[i]f I wasn't aware who she was." Id. Speculation such as this is not sufficient to give rise to a genuine factual dispute to stave off summary judgment. Smith v. Henry Branscome, Inc., 161 F. App'x 212, 214 (3d Cir. 2006); Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Moreover, the evidence shows that Hernandez took her first and longest look at Younge's files on June 24, 2016, Hernandez Dep. at 83-84, which was the same day on which she sent her initial "cease and desist" letter to Younge, Def.'s Mot. Summ. J. Ex. 10. Hernandez testified that she wrote that letter because Younge had been making harassing phone calls to her work telephone and sending letters to her work address. Hernandez Dep. at 38. The notion that Younge might have called Hernandez that same day after having harassed her at her workplace and asked Hernandez to look at her gynecological records is simply untenable. Similarly, the idea that Hernandez would not have recognized Younge's name and would have agreed to comply with Younge's request that she look into Younge's record is even less tenable. And, the idea that Hernandez would have responded to assist the person she had demanded stop harassing her and then not be able to recall that incident is patently unbelievable.

employer's proffered reason simply by showing that the employer's decision was 'wrong or mistaken.'" Gardner v. Sch. Dist. of Philadelphia., 636 F. App'x 79, 86 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 765). Hernandez's allegation that Temple never asked for her explanation of events is insufficient to raise a genuine factual issue regarding whether Temple's stated reason for her termination was pretextual. There is nothing so inherently unbelievable about Reynolds' testimony that she thought an interview of Hernandez was unnecessary when Temple had discovered conclusive evidence that Hernandez had examined the personal medical files multiple times of a woman with whom Hernandez had a dispute over her husband's affections and in whose medical treatment she had no legitimate involvement. Whether Maikner would have been wiser to obtain any explanation Hernandez might have offered is not the point. Her failure to do so under the circumstances is not a sufficient basis on which a jury reasonably could infer that her real reason for terminating Hernandez's employment was retaliation for Hernandez's use of FMLA leave. Hernandez's retaliation claim, therefore, must be dismissed.

IV.     **CONCLUSION**

For the reasons stated above, Hernandez has failed to establish that any genuine issues of material fact exist that could allow either her FMLA interference claim or her FMLA retaliation claim to survive summary judgment against her. Accordingly, Temple's Motion for Summary Judgment will be granted. An appropriate Order follows.

Dated: January 8, 2019

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE